Good morning. May it please the Court, Jerome Falk. For appellants, I'll reserve five minutes for reply. I want to begin with the 10b-5, ground for non-enforcement of this settlement. You're letting your voice drop. I'm sorry. You're a little closer to the microphone. Yes, that's wonderful. Thank you. I'm sure I don't want to miss a word. I appreciate that. At the time of the settlement, Facebook had publicly announced a substantial investment by Microsoft based on a $15 billion valuation that translated into $35.90 a share. Unbeknownst to the founders at the time of the settlement, who did know of the Microsoft investment, the Facebook board had recently approved a valuation for stock option purposes of $8.88 a share, about a quarter of the $35.90 figure. That was not disclosed to the founders until after they had signed the term sheet. How did that come to light? It came to light in a conversation between the founders' transactional counsel who were engaged to work on the documentation of the settlement. It actually became So why didn't that conversation occur earlier? Well, that would they weren't, I think, at the mediation, you mean? Yes. I mean, you asked them other questions. You asked how many shares were outstanding and so forth. Yeah. Why didn't you ask about that at the time instead of relying on a six-month-old press release? I believe, I'm not sure that this is in the record, but mediations are usually with people in different rooms. Well, so? There's not really any opportunity to talk to one another. In any event, the duty of disclosure is a duty on the issuer. It's not a duty of inquiry on the part of the investor. The question wasn't asked, and it could have been asked, no doubt. These were litigators, not business lawyers. They probably should have asked the question, but it was an important fact. Well, they said they had no duty to disclose it in this context, and here you are asking questions back and forth, negotiating. You have a team of lawyers on both sides, and this question could have been asked, probably should have been asked, wasn't asked. I can agree with all of that. It should have been asked, it could have been asked, and it wasn't asked. It came up. You asked how it came up. The record doesn't tell us exactly what the conversation was, but it was discussed in the context of an issue that arose as to how to deal with the fact that Facebook was assuming liabilities of ConnectU, the company they were acquiring, and there would be an adjustment, they said. There should be an adjustment of the number of shares of Facebook that are going to be issued. At that point, Facebook said, well, we'll use the valuation of $8.88 that we recently got, and at that point there was a terrific disconnect between the price on which the shares were being issued in the first place, $35.90, and the price that the adjustment was proposed at, and that's when the case, the settlement came off the rails. Scalia. Was the $35.90 subsequent to the agreement to settle? Kneedler. Yes. Yes. Kennedy. Was the $35.90 part of the agreement here? Kneedler. Well, it was in the sense that the parties agreed. Kennedy. That sounds like a long no. Kneedler. No. No, it's a yes. Kennedy. I didn't. I looked at the term sheet and it said nothing about it. Kneedler. No, it's not explicit. It's not explicit, but it's there. Here's how it's there. The parties negotiated for a $65 million settlement. They then negotiated for a division of that between cash, $20 million, and stock, $45 million. Kennedy. How do we know this? Kneedler. We know this by declarations, and those declarations are the subject of the mediation privilege issue. Kennedy. The ones that are subject to the agreement that says you can't disclose it for any purpose? Kneedler. That's right. And that raises the question of the mediation privilege and the agreement and the fraud exception that every state that recognizes a mediation privilege except two have recognized an exception where there's a disclosure. Kennedy. But here you have more than just a mediation privilege. You actually have an agreement. You have a contract that says it will not be used for any purpose in any litigation. Kneedler. Well, the contract has to be interpreted. You know, it has to be interpreted, and it needs a reasonable interpretation, given the rather substantial body of law. Kennedy. I don't understand. I mean, it isn't never, never? I mean, what is there to interpret about never? I mean, what is the exact language of the agreement? Kneedler. I think it refers to that. All statements made during the course of mediation or a mediator follow up thereafter at any time prior to complete settlement of this matter are privileged settlement discussions that are nondiscoverable and inadmissible for any purpose, including any legal proceeding. I mean, I don't think I could draft something that was any more categorical than that or less subject to interpretation. Roberts. Well, but that then raises, if you interpret it literally, I suggest that it has a, that there needs to be a reasonableness overlay. But if you don't agree with me on that, then you are brought to Section 29 of the Securities Act of 1934, because by giving it that interpretation so that it can be used as a shield against a claim of fraud, you are in effect immunizing fraud in the case of a fraudulent action. And that is in effect an advanced waiver of securities duties and rights that would be condemned by Section 29. I just want to say that. So you want to put positions that 10b applies to any settlement involving stock? Yes. And what authority do you have for that? I don't have any authority, because the issue was, as far as I know, has never been raised. It's highly counterintuitive. I mean, this is not a sale in the market. This is not, I mean, forget about the fact that it's not a public sale, but it's not even a private sale. These are two people who are negotiating about the future of a company, and decide to, they're litigating about ownership rights in a company, essentially, is what's going on here. And they decide to settle the differences by sharing the stock of the company. And you would have 10b apply to that? Yes. And, I mean, 10b, there are no exceptions that I know of that have ever been recognized for 10b based on the context of the transaction. It applies to all sale exchange of securities. This is a sale or exchange of securities. It doesn't matter that it's not public. 10b applies in nonpublic transactions. And it seems to me that it would be a very inappropriate exception. But if it is, it's for the SEC to adopt, not, this is not a, or for Congress to adopt. 10b is unequivocal, without an exception. 10b-5 has no exception. May I go back, though, to the point about the mediation privilege and the agreement? I don't think we need to get into the statements that were made in the mediation. I got into it because one of the members of the panel asked me a question, how do we know that it's 3590? And I had to answer the question by reference to what was said. If you find that the evidence. You said 3590. So you started out by saying that the deal was based on the idea that the shares were worth 3590. And then there was this valuation, so it was less. So you got into it. No, I got into the 35, the 3590 figure comes from the Microsoft transaction that was publicly announced. It is, you don't. You don't know from the term sheet that 3590 was used in this settlement. And you asked me, or one of you asked me, how do I know that it was used in the settlement? And to answer that question, I have to get under the lid of what occurred in the mediation. But I don't need that for purposes of my 10b-5 contention. And the reason I don't is that we do know from the term sheet that 1,253,000 shares of Facebook stock were issued as part of the settlement to my clients. And we do know that the value, because it's obvious, that the value of what they got is material to the transaction. And we do know that an $8.88 internal valuation was never disclosed to them. Why do you say we do know it was material? Because the value of the securities that they received is the very thing that anybody who was about to acquire those securities would want to know. Well, yes, you have to say, in all cases, they look at this. But that isn't necessarily true. I don't know if the documents are still under seal under the case of attorney's fees and the case against the lawyers for malpractice. But I've looked at them. And there's a strong argument can be made that it didn't matter in this case. What mattered was taxation situation. Now, you can't just make a decision here that in all cases this is going to happen, can you? Well, I think materiality is judged on an objective standard, not a subjective standard. What a reasonable investor in the circumstances would want to take into account in deciding whether to go forward with a transaction. Under an objective standard, I think that it is indisputable that a person acquiring a very large number of shares would want to know what the valuation was that the company had performed and was issuing stock options based on. Are these still under seal, these documents and these other cases? We can take judicial notice of them. Yes, they're still under, I believe, they're still under seal. But suppose, suppose it turns out that, in fact, that isn't the situation, that they had other reasons for accepting it regardless of the particular flow of the price of Facebook stock. We would be, if that were the case, then we would be deciding it based upon what you say is always the situation when it may not be. Well, but I think the reasonable person objective standard is separate from what may or may not have been in the minds of the particular individuals. However, that's right. But I'm just suggesting to you the possibility that it didn't make any difference whether the price was $8.50 or $31.50 or whatever. That's possible. I don't believe the record, sealed or unsealed, supports that conclusion. I don't think there's anything in the record that would support the conclusion that they were indifferent to the value of the securities that they were receiving. Does it matter that this was an omission rather than an overt misrepresentation? No. Facebook says that it does. Facebook takes the position that it had no duty of disclosure under Rule 10b because the founders were not then shareholders of Facebook. They acknowledge that under the cases if they were buying stock back from an existing shareholder, they would have a fiduciary duty and they would have a duty of disclosure. But they say since these are strangers, we don't have any duty. That argument has been rejected by the SEC and Katie Roberts in 1961. It was rejected by the Supreme Court in Chiarella in footnote 8, which cited Katie Roberts and a learned hand opinion on which the SEC relied. Judge Hand wrote that it would be ridiculous. He didn't use that exact word. That it would be a sorry distinction, was Judge Hand's more elegant phrasing. It would be a sorry distinction to distinguish between a prospective buyer of stock on that basis because immediately after the issuance of stock, Judge Hand wrote, the buyer would be owed a fiduciary duty and therefore the buyer is owed a duty of disclosure immediately before as well as immediately after the transaction. The Supreme Court cited all that with approval in Chiarella. And then this Court cited it in SEC v. Murphy, cited on page 7 of our report. What kind of business and internal evaluation does that have in any event? It is not like having an undisclosed liability. I mean, let's say there's some tort suit that's pending, an undisclosed liability. I mean, this is an internal valuation. These are parties that are negotiating. They're litigating. What they're really litigating about is the value, the ownership of the company, of the intellectual property, the value of the company. It seems a little strange to say that you have to disclose everything about the company in that kind of negotiation. Well, you have to disclose everything that's material. They were issuing the reason that companies get these kinds of Why is this material? The reason that companies get these valuations is because they are not permitted without adverse tax consequences to issue stock options at a lower price. So these are used in order to set the price at which stock options to key employees are issued. So it's I know what they are. The question is They're done, but that means that they're done for, they're used. So this was adopted by the board, and then stock options are issued on the basis of it, and it has tax consequences if they're wrong. I mean, what more reliable indicator of value of shares that are not traded on public markets? It's an opinion, and it's an opinion that's given for a certain purpose. That's quite different from saying we have undisclosed liabilities or there are sort of failures in the business plan. This is really quite a different matter. I agree that it's not the same thing as a fact on the ground, but it is a fact. It was an opinion of the outsider. It becomes an act of the board when it approves it and an act of the board when its stock options are issued based on it, and it becomes a fact on the ground when, as here, Facebook attempted to use this valuation as the basis for determining the adjustment to the number of shares that the founders would receive. I mean, they thought it was a pretty good valuation. They said, yes, if we assume $5 million of debt, we will adjust the number of shares you get by $8.88 a share divided into the $5 million. I mean, how much more indication do we need that the company thought this was an important material valuation when they used it in the post-settlement negotiation? My time is closed up, and I do want to allude to the other ground here for setting aside this settlement, and that is that the settlement was incomplete. This was an unusual settlement. Typical settlements are about money and how much and the form of a release, and those can be documented very easily. When this settlement took the form of an acquisition of the founders' company in return for the issuance of 1,200,000 plus shares of stock, it became a corporate acquisition and a stock issuance transaction, which carries with it a great deal of complexity. And by the time Facebook's lawyers drafted definitive documents for this transaction, there were 140 pages of single-spaced legalese, and they covered a great many things that are nowhere to be found in the term sheet. And when they went to court to enforce it, they filed a declaration with the district court of their expert, which said, Well, all this 140 pages of legalese, while not in the settlement agreement, is material and traditional and customary, and we're just dotting the i's and crossing the t's. But they aren't – but they represent a whole lot of choices and points of – But the view of the term sheet specifically gives Facebook the right to do that. Facebook will determine the form and documentation of the acquisition of ConnectU shares. Well, that – whatever that means, it doesn't mean they get to decide everything. They have an argument that it allowed them to decide whether it would take the form of a stock sale or a merger. But that's a big deal, and that kind of delegation leaves the contract itself unenforceable because one party can't decide material terms like that. But there are other – Why can't the parties negotiate that certain terms will be decided by one party, and you give up something in negotiations for the right to make that decision? Why isn't that as good a term as any? We cited some cases in our brief that say that can't be done under California law because it leaves the contract uncertain. But even if I'm wrong about that, Judge Kaczynski, giving them the right to dictate the form of the transaction, that is, the form of the acquisition, wouldn't cover all of the list of incomplete, unaddressed issues such as the representation and warranties, who was going to be released. There are a number of issues that simply were not addressed. And I think it's understandable what happened. Because it became a corporate transaction, a stock issuance transaction, litigation lawyers may not have been equipped to even think through the issues that they were taking on. And when Facebook comes in with 140 pages of transactional resolutions in the form of the documents that they drafted, that tells you, that tells a court, that the parties hadn't reached agreement on those terms at the time. I know your time's up, but just respond to this, please. Surely. The funders are pretty smart people themselves. They also had five lawyers from two firms sitting there with them. The twins also have a father from Wharton School who's very bright, considered to be in evaluation one of the top people. It wasn't like an individual without help. If you have all of these people there to advise you, isn't it a little difficult to say that this is one of these things in which they were taken advantage of? I haven't used that phrase, apart from the securities issue. No, you haven't. Look, I agree that my clients were not behind the barn door when brains were passed out. Yeah, yeah. But the same is true of Facebook. You had sophisticated people in the rooms on both sides. The fact is that they chose to resolve their mediation probably late in the evening, if this is like most mediations, and go home before they addressed important commercial terms that have to be in there. And when I say have to be in there, I rely on Facebook's expert, who said these are things that have to be in there. And they aren't in there. You can't find them in the one and a third pages. You find them in 140 pages that Facebook tried to get the district court to treat as part of this settlement. The district court didn't do it. So you have an incomplete transaction. It's just like. But you're saying more than that. You're saying a transaction like that can't be completed. You can't have a mediation. I mean, if you can't have sophisticated parties on both sides with a team of lawyers and a father who's an expert in the field, if they can't, and with a professional mediator, and they can't put together a deal to settle the case, it can't be done. Well, I don't agree with that. And that upsets the applicant on all sorts of mediations. I'm glad you asked that, because I. I mean, it could have continued the next day. It could have said, look, we'll go another day. We'll go another day. We'll go back. We'll get another team of lawyers in here. We're not going to sign until the thing is reasonably, until some of these terms are done. But we do have, both in law and in life, agreements that can't be, disagreements that can't be resolved in one day. Sometimes it takes two, and sometimes it takes three. Nothing prevented them from taking two or three days. No, but they didn't. The parties are jointly responsible for this. This is not Facebook's doing alone. Both sides walked out of there saying we had a deal without having a deal in the way that the law requires to have an enforceable contract. And both sides have to take responsibility for it. But I don't want to leave you with the impression that it couldn't have been done. People who go to mediations nowadays bring laptops. And they know how to call partners and get people over there who, when this mediation took the form, went down the road of a corporate acquisition and a stock issuance, the resources they needed changed. And they may not have had the right people in the room to do that. They were using quills. Well, they did. They used a handwritten, it's a handwritten term sheet. They probably didn't have computers in those days. Two years? Two years ago. Two years ago. They probably didn't have cell phones or laptops. Two years ago. But they didn't do it. And that's the problem. What do we do? It doesn't matter whose fault it is. They didn't do it. And they found themselves arguing for weeks about what the settlement was. These are people in the computer business. I would think if anybody, you know, this is what they do for a living, right? Both sides can take equal responsibility. The fact is they didn't finish the job. And if it meant staying later or coming back the next day or doing it on a simpler basis, if you want to have a binding deal, you have to. I've seen binding deals in a third the size of this one, much fewer terms. And they stick. You'd want to know if there are representations and warranties. Facebook said it's customary to have them. You'd want to know if there are restrictions on the stock when you have a private placement of securities. Facebook said you have to have them. They didn't have them. They hadn't addressed it. You can waive stuff like that. You can, but you have to discuss it to waive it. There is no evidence that they ever thought about these problems on the night they signed the term sheet. And that's the problem. This is just like the two cases we cited, Terry v. Conlon and the Weddington case that Terry v. Conlon cited. I know a lot about Terry v. Conlon because that was a case I was involved with. And you had exactly the same problem of a very simple settlement. That one was done on the record in a judicially supervised settlement conference. And the parties had envisioned a very complex transaction with a Q-tip trust and all sorts of detailed things. One side drafted it and proposed a whole lot of things that were not covered on the record settlement. And the Court of Appeals, Sixth Appellate District, said you don't have a settlement here. You have the beginnings of one, but there were all sorts of issues. And they said, and we know that because one side then went out and tried drafting these things. And they were – and in doing so, they were addressing matters that had not been discussed at the settlement conference. Okay. Thank you. Thank you. Good morning. May it please the Court. This case is about whether sophisticated parties surrounded by a platoon of world-class lawyers can cancel a deal that they said was binding, that everyone believed was binding at the time. The district court correctly answered that they can't. Turning directly to Mr. Falk's primary argument, no one was misled here. Judge Wallace was right. The Connecu Founders were not interested in pinning down the momentary value at that particular moment in time of a subjectively extrapolated valuation that is, as Chief Judge Kaczynski said, merely one entity's opinion. They were interested in owning a specified portion of the world's hottest startup company. Precisely .3000 percent is what they wanted. And they wanted it in undiluted form so that no matter what happens, they will always own that share of the company. The Connecu Founders knew that valuations were all over the map, as one would expect them to be. They had all the information they wanted. And if they wanted more information, they could have asked for it. Now, let's just suspend all disbelief, despite the revelations that Judge Wallace mentioned earlier, that casts doubt on the Connecu Founders' version of what occurred, and accept as gospel the Winklevoss Declaration as to what occurred. Well, that means that you're considering those declarations are unsealed? For — I'm talking right now, Your Honor, just about the account of the mediation. They are, for all intents and purposes, essentially unsealed because the parties These exhibits, I assume, are sealed exhibits. This is in the malpractice case and the arbitration. No, Your Honor. Let me put those aside. Those are the exhibits that raise doubts about the Connecu Founders' version. I'm talking about the version of what occurred at the mediation that Mr. Falk has presented to the Court through the Declaration of Cameron Winklevoss. And let's accept that for argument's sake. So are you waiving the mediation provision? Not at all, Your Honor. I'm accepting it for argument's sake, for purposes of this argument, because there is a separate argument that this Court cannot accept those. They were contractually obligated not to use them in a court. But I'm saying let's talk about securities fraud and whether those declarations even present a case for securities fraud. Now, according to the Connecu Founders, they — So you're not conceding that's what happened. You're just saying accepting as true what the declaration is. Absolutely. In this daily case. Absolutely, Your Honor. We hotly dispute, if we ever got back to the district court, which I expect we won't, we would be disputing that account based upon those other revelations. But let's do a summary judgment or a motion to dismiss analysis of their presentation. Their argument is that they and all of their lawyers based their entire negotiation posture on an assumption that they made based upon four words in a press release, $15 billion evaluation. They did not communicate that assumption to Facebook or, for that matter, to the mediator. They didn't see confirmation of the assumption. They did not demand more information, as they had every right to do. I mean, for goodness sake, they were in the middle of discovery. They didn't even try to reconcile that assumption with the other data points that they had, all of which were drastically below this $36 figure that they claimed to have had in their head, and, in fact, lower than the $888 figure. They expected their adversaries to know what was on their minds and then to spoon-feed them information that one might use to conclude that their assumption was wrong. Now, if we accept their version of what occurred, they are not victims of fraud. They are outright imbeciles, because no one would ever assume a negotiation posture like that based upon those four words. We also know this can't be fraud because the information was immaterial. No person who had what the Supreme Court refers to as the total mix of information that the ConnectU founders had would ever use this one opinion, as Chief Judge I mean, Mr. Falk's entire presentation is based upon this myopic notion that the only number that they had in their heads was this $15 billion, $36 per share number. But it wasn't. They had lots of other valuations. They were all lower, and drastically lower, by the way, than the $15 billion number. The truth is that this later 409A valuation was not some seismic event, as if a bolt of lightning came out from on high and emblazoned 888 on a pair of tablets. It's an opinion. It's an opinion by one person, one entity, that routinely issues these sorts of opinions. I mean, they're quarterly. The ConnectU founders and their advisors had to have known that these things come out, and they knew a whole bunch of previous 409A valuations. The most recent valuation that they had to have known of was a 661 per share valuation that came out contemporaneously with the $15 billion valuation. The simple point here is that no one ever knows in a market like this what a private company like Facebook is actually worth. No rational person in the ConnectU founders' position would ever base a deal on one supremely subjective. Are you accepting the applicability of 10B to this kind of transaction? Your Honor, let me be very precise in my answer. We have not contested that 10B applies, that fraud rules apply in securities transactions. But the question is how they apply. So, for example, 10B has one set of rules for misrepresentations. It has a different set of rules for the duty to volunteer information. And those sets of rules, based upon absolute Supreme Court precedent and precedence of this Court's say, that just like common law fraud, which the ConnectU founders have abandoned, in a 10B-5 allegation, in a 10B-5 case, there is never a duty to volunteer information to your adversaries in a face-to-face transaction. There is, in other words, to take it a higher level, never a duty to volunteer information except when there is a relationship of trust and confidence. Now, if one thing is clear from the six years of litigation in this case, it is that the ConnectU founders and Facebook had no mutual relationship of trust and confidence. So I am not saying, as the ConnectU founders have suggested, that securities laws are out the window in a transaction like this. I'm saying that securities laws need to be followed exactly as the Supreme Court and this Court have taught, and that the securities laws say that there's no duty to volunteer information to a person in a face-to-face transaction. I mean, these kinds of transactions, private equity deals, mergers and acquisitions, are ubiquitous. The use of stock as currency in a transaction. And no one in those worlds believes that they have a duty to volunteer information to the person on the other side. They do due diligence. Now, it's called due diligence because you're supposed to be diligent. The way it works in M&A, the way it works in private equity, is you ask me questions and I give you answers. I give you straightforward, honest and complete answers. But as Mr. Falk has said, they didn't ask the question. Well, this particular is kind of a unique case. You don't have lawyers sitting around for day after day, dotting I's and crossing T's. You've got two contentious bodies coming together to try and make a settlement, a global settlement, and they're trying to work out a deal. Now, it strikes me that the mediation protection is for a good idea. You want the people to be honest and say things and won't come back to haunt them later, and that's why we have it. But do you agree that that mediation protection must give in if there's a claim of fraud, at least to the extent to find out whether or not there was a fraud perpetrated? Absolutely not, Your Honor. And let's take it in two parts. There's both the mediation protection and there's the release issue. In the release context, this Court in Petra Ventures was very clear. You can release unknown claims, even unknown claims of fraud. You're big boys, and if there is a claim, particularly a claim of a fact that is omitted, big boys can make deals that bind them for the purpose of litigation peace, as this Court said in Petra Ventures. As to the mediation privilege, it is simply not true that there's a fraud exception to the mediation privilege. Certainly under California law, there isn't. Under the agreement that the chief judge read to the Court, there wasn't. It is very clear that what the parties negotiated for was litigation peace. Well, they had that, but what you're saying, if I understand it correctly, was the statement in there that they're going to give a release in the broadest terms includes fraud. That is, they're releasing in the broadest terms, then they're releasing all claims known and unknown. Yes, Your Honor. That's precisely what it means. The broadest terms that are known. Let's suppose for the sake of argument that there was a fraud committed by Facebook on these people. You're saying that they can't pursue that based upon the litigation privilege or the terms of the contract? Based upon two distinct provisions. Excuse me. Let me answer it more clearly. Based upon two distinct arguments. One is that they affirmatively released and Petro Ventures controls. And second, that the evidence that they would use to prove the fraud, they agreed not to use, and it is unusable in a court under three bodies of law. A contract that they signed prospectively, the mediation privilege. The mediation contract? The confidentiality agreement. Yes, Your Honor. Before the mediation. And by the way, there's the third area of law is California law, which is incorporated by reference into the confidentiality agreement. There is a reason that parties agree to terms like these in advance that mediators insist upon them. And that is the way it works, as Mr. Falk pointed out, is that parties are in different rooms, and they have no way of knowing what is exactly said to the other side. So you never want to put a mediator in the position of having to testify in a deposition, oh, yes, she said this to me, but I actually dissembled a bit, and I didn't repeat it to them. And the party that is held liable for the omission has no way of ensuring the view. I'm now completely confused. There are two concepts going on here. There's confidentiality, and there's privilege. And confidentiality is you and I have a contract, and we say, you know, we're not going to tell anybody about what we settled. And if you disclose, I can sue you for damage to my reputation or whatever, right? That's not a privilege. That's just a contract between us. Privilege is something else. It's something that the law provides and says certain transactions or certain communications that simply may not be introduced in a court of law during a proceeding. I mean, different concepts. Now, if I understand correctly, the privileges are created by, in federal court, are created by the federal rules of evidence, right? Well, yes, Your Honor, but also by the mediation privilege. The local rule. The local rule. Well, that's a question I have. We have the federal rules of evidence. And what gives authority to local courts to create privileges? I mean, privilege is a species of substantive law. Yes. For example, in diversity cases, Congress decided that we apply state privilege, whereas in questions, in cases involving federal law, we apply federal privilege, which is Article V of the Federal Rules of Evidence. How do local courts have authority to create privileges? So let me break it down, because I first addressed the first half of the question about the confusion between privilege and confidentiality. This contract, putting aside the rule for a moment, does both. This contract says that the parties will keep something confidential and then binds the party, and I quote, no aspect of the mediation shall be relied upon or introduced as evidence in any arbitrary judicial or other proceeding. So it creates what I would call kind of a hybrid between privilege and — You can't create the privilege by contract. Privilege is something created by law. You can have a contractual arrangement that has certain effects that may or may not parallel privilege, but it's not a privilege. I understand, Your Honor. So now to answer the second half of the question, Congress gave the federal courts the right to adopt these rules and, in fact, directed them to in 28 U.S.C. Section 652, which the — which Congress enacted in order to require the courts to adopt these rules. And finally, California law adopts what California calls a privilege as well, and the parties were bound by that. But what about Rule 408? I mean, doesn't that also make this stuff privileged? Well, Your Honor, Rule 408 would allow the creation of a Federal common law privilege. But we're not even arguing a Federal common law privilege. But I don't want to lose the chance to at least address also, if it's okay, Mr. Falk's argument about the contract, unless the Court has other questions about the securities fraud piece. So on the contract, let's start with some common ground. The parties wanted this deal to be binding. They explicitly said it was binding. The nine lawyers in the room all believed it was binding. Now the ConnectU founders are asking this Court to override their stated and intended purpose and everyone's stated intention and make this contract nonbinding. Now, especially in exigent circumstances like these, Your Honors, parties are allowed to decide for themselves what is material to them at that moment. They are entitled to say, you know what? If this were a normal merger and acquisition, we'd have 140 pages. But right now, right here, right now, what's important to us is getting a deal at this price point on these terms and not, as opposed to not having a deal at all. Tony Piazza is a brilliant mediator precisely because he knows how to get parties to shed the intricacies and the details and focus on what's most important to them in that moment, at that moment. There is no platonic norm that says there have to be more than three representations and warranties in agreement. Here there were three. Each side negotiated for what they wanted represented and warranted. And you don't have to bring a laptop in order to make a deal enforceable. The district court correctly found that this agreement was sufficiently definite to be enforceable. Simple. It was give the way to make it enforceable is if you know what each party is required to do to perform. Very simple. You turn over the stock, you turn over the stock in cash, and each of you dismiss your lawsuits. Unlike in Terry v. Conlin, which Mr. Falk focused on, the district court did not have to make up any terms. It was perfectly clear what everyone agreed to. Now, merging the securities fraud piece and the contract piece, I just want to step back from some of the more specific questions and be clear of the gestalt that we're talking about here. All of the factors that this Court and other courts have considered to make a contract enforceable and to make it resistant to a claim of fraud converge in this case. We have sophisticated parties that are represented by counsel. They are in the middle of litigation. They didn't have any question about what they now claim they wanted to know about. If they had questions, they could have asked them. They're not claiming an affirmative misrepresentation, but only an omission, and it's an omission of an opinion and not a fact, and an opinion that if it's relevant at all is only marginally relevant to the overall picture. So when all is said and done, the ConnecuFounders position strikes right at the foundations of both mediation and settlement. Mediation just doesn't work if mediators cannot capitalize on the exigency and get right to the nub of what the agreement can be about by reaching a deal on the terms that the parties at that moment consider material. Chief Judge Kaczynski was right. Settlements don't work if parties, like these represented by counsel, are free to invalidate a deal just because they think better of it or wish that they had one extra piece of information. The ConnecuFounders struck a deal that made them very, very rich, and it's making them richer by the day. No one made them sign the deal that they signed. Part of the bargain was a declaration to the end of the war. At some point, it's time to move on. The district court was correct in concluding that the parties who agreed that the war was over should be bound by the Declaration of Peace, and this Court should affirm. Thank you, Your Honors. Roberts. Thank you. Mr. Faulk, your time will give you two minutes for rebuttal if you wish to take it. On the last point that Mr. Rosenkranz addressed, he makes the observation that the parties wanted the contract to be binding. I don't disagree with that, but that's not the issue. Under California law, whether you want it to be binding or not, it isn't binding if it omits material terms. That was the problem with Conlon. It was the problem with Weddington. And here, there was never any agreement to dispense with material terms. They thought at the time, presumably, that they had covered them, but they hadn't covered them. There is no mediation exception to the California requirement that a contract contain and deal with all material terms. And the list ---- You know, it's so easy afterwards to come, you know, these mediation agreements tend to be short and they tend to be bare bones with the idea that things will be But the idea is that everybody thinks, you know, we've got a binding deal. It's easy to come up afterwards and say, well, we really thought this was material. We thought this was material. To me, this looks like it's got a lot of just about everything you want to want in a contract. It says the terms, you know, how many shares, how much cash. It definitely says we want to ---- we're having a binding agreement. Judge Kaczynski, though, this wasn't some invention by us. The way we identified the issues that were omitted was to look at the definitive documents that drafted by Facebook in which they attempted to insert into the transaction a number of things that they said were material and that should be in there. This is their list, their expert who said these are material. That's how ---- so this is not some invention by clever lawyers for the Winklevosses. This is Facebook's own list. And we've just taken them and said these are material and they're not in the term sheet. And so that's how we got here. No, the district court rejected those, right? Well, we're here because we lost in the district court. No, no, but in ---- Oh, I'm sorry. I understand your question. Yes. The district court ---- They try to insert things that you say are material and they think are material and the district court says, and I'm not going to add them. I'm not going to enforce those. It's a very odd solution because both sides were acknowledged ---- Almost Solomonic, isn't it? Both sides acknowledged that these were material terms. Facebook contended they were material terms. We didn't disagree with that. We just didn't agree what they ---- we had never ---- Well, the district court said they're material, but they're additional terms. And being material and additional, I'm not going to enforce them. Right, which sets up the issue for you, which is did the term sheet omit material terms? And if the answer is yes, then under ---- then as a matter of California contract law, we don't have ---- But I think we're using material in different terms. You want to use the word material as being sort of necessary to the transaction, material in the sense that without those things you don't have a deal. Where I think what the district court says is these are material in the sense that they would change the terms of the deal. And therefore, I'm not going to import them into the deal. I'm not going to enforce them because they are material and in the sense that they vary the deal. I don't see why that isn't exactly the right solution. Well, both uses of the term material are appropriate. But the use I'm making of the term material is ultimately a conclusion of law that this is the kind of thing that are ---- that is common and normally included in transactions of this kind. And Facebook's own experts said the same thing in the declaration that was presented to the district court when they were trying to get the district court to adopt those terms. So they are in a sense hoisted on their own petard on this point. They said these were material. They said these are customary. And they happen to be right about it. I mean, how could you imagine? You couldn't imagine a private placement of corporate securities involving millions of dollars worth of stock without restrictions on transfer. I mean, securities laws, you know, and practices in the industry require it. You always have that. And you have negotiations about registration rights and all sorts of things. These parties didn't address those. That's just one of a half a dozen things that were left out. The legions of lawyers apparently thought they were unnecessary. But let me ask you a question. Or they overlooked Judge Wallace, which I think is really what happened. They didn't address them. Maybe. I wanted to ask a question. You reliance a lot on State law as to saying Federal law. And I want to find out your view about this case of Petrovetsch's authored by Judge Levy, who just happens to be one of our best mediators, too, but he feels strongly about it. In here, it says that when there are violations of both Federal and State securities law are alleged, it is well established that Federal law governs the questions relating the validity of and defenses to the purported releases of Federal statutory cause of action. Doesn't that push us over into the Federal side rather than the State side? I'm just wanting to know where I'm going to look for law. Yes. On the validity of the release, I think that you do. I think on the formation of the contract, you would look to State law. But I don't think Federal law would be different, even if I'm wrong about that. This is stuff straight out of Williston and Corbin that you have to have all material terms covered or else you don't have an enforceable agreement. How would you distinguish this case of Petrovetsch's, who takes this broad idea that when there's litigation occurring and you get the release, that ends it, that the people want to get out. We shouldn't bring them back in. How do you distinguish Petrovetsch's? Petrovetsch's deals with the release of an underlying theory of liability relating to the underlying claim that was settled. And the plaintiff came back and tried to re-raise after a settlement a claim that he could have raised at the time and hadn't thought of. And the court said, no, a release of all claims bars every theory that you might have had. It had nothing to do with a claim of fraud in the inducement of the settlement itself. Does it mean every claim means every claim? That is, we're getting rid of litigation. There's a benefit to going on, to walking forward. We cited a great many cases in our briefs that draw that exact distinction. Yeah, I know. That's why I wondered about Petrovetsch's. I didn't see it. Well, they said that Petrovetsch's involved a claim, an attack on the settlement itself. And they say that in their brief, and it's not true. And so we got the briefs in Petrovetsch's and asked you to take judicial notice of them. And when you look at those briefs, you will see that our description and our characterization of it is accurate. It's a conventional case. It's perfectly correct. I have no problem with it. But it does not involve a claim that the settlement was itself produced by fraud. The California cases, which are not directly applicable but are a good, you know, source of advice, have dealt with that. There's a case called Ron Greenspan-Volkswagen, which we've cited in our opening brief, which explains that if a settlement is produced by fraud, then the release that's in the settlement is itself the product of fraud and falls with the settlement. I know my time is up, Judge Kuczynski. Thank you. Thank you very much. The case, as I saw, you will stand submitted. We are adjourned. All rise.
judges: Kozinski, Wallace, Silverman